## HEATH et al. v. DIVERSION LAKE CLUB.

No. 8580.

Court of Civil Appeals of Texas. San Antonio. Nov. 12, 1930.

Rehearing Denied Dec. 17, 1930.

Matlock & Kelly, of San Antonio, for appellants.

Hertzberg & Kercheville, of San Antonio, for appellee.

COBBS, J.

This is an action by Diversion Lake Club, appellee, to enjoin R. W. Heath and M. L.

Matthews and several others, appellants, from trespassing upon lands claimed and operated as a fishing club resort by appellee. Upon a hearing thereof, the trial court granted the application.

This is a particular irrigation enterprise to impound flood waters for irrigation purposes. The state authorized the erection of two dams on the Medina river situated close together. The first and main dam holds the big lake and the second or Diversion dam, situated below the main dam, holds temporarily the water which is used first for irrigation. Out of the Diversion reservoir water flows into the irrigation ditches onto lands situated miles below in three different counties. This water comes from the Medina river. There are two dams on the Medina river, and this water is restrained from flowing in the river by reason of such dams. Of course, since building the dams boats cannot pass up and down the river. They could not do so before because the river did not contain the requisite flow of water. It was a little mountain stream of only ten or twelve feet in width and about twelve inches deep, before the building of the dam. After the building of the dams the size of the water was enlarged; the dams were about four miles apart. When the two dams were built, original owners bought all of the land between the two dams on both sides of the river, and the only exception to this is a public road which crosses the river between the two dams. All this land, after leaving the public road open, has long been inclosed, and gates leading into it are locked. All this land was then sold to the Diversion Lake Club, appellee herein.

Appellants claim no title whatever, only the right that any other member of the public may have to go in and on said premises. Since appellee has owned the land, it has remained fenced, and the gates locked, and the members of the Diversion Lake Club use said waters for their own purposes.

About twenty-five members comprise this club. And they not only bought the land on both sides of the river between the two dams, but have spent a great deal of money improving it—in excess of $125,000. They use this land for raising deer, turkeys, and quail, for hunting ducks and fishing, and the use of the property is restricted to the members of the club.

We quote with approval from appellee's brief the following:

"The land is divided in four pastures completely enclosed, with a caretaker in charge; the caretaker has a few cows and horses on the land. The property is used mostly for summer homes and recreation purposes by the members.

"On the question of the navigability at present, Mr. Frost Woodhull testified:

" 'A boat cannot be rowed over the portion from the bridge up to the main dam, which, I think, is not quite a mile. It cannot be done, in the first place because there are rapids in there and in some places the stream would be too shallow to row a boat over. You could wade and drag the boat but you could not paddle a boat. I should say there would be a stretch of 75 yards or probably 50 yards, that would probably run around a foot deep, possibly less, with a swift current and I wouldn't like to take the job of rowing up against it.'

"Mr. Woodhull testified to the title to the land up to the center of the river and including the bottom of the river. The statement about the patent is hearsay and secondary absolutely.

"Mr. Stegal, the caretaker for Diversion Lake Club, testified that the Government has a fish hatchery there. The roads are posted along the river and the gates are kept locked.

" 'I have seen the defendants R. W. Heath and M. L. Matthews out on that property. Mr. Heath and Mr. Matthews come there ordinarily on Friday. They seldom miss a Friday coming there until recently, and they have a boat there at the bridge, and they fish down the lake; they cruise down the lake from the bridge. They come in at the east side of the bridge and put their boat right in the water and go in under the high wire fence stretched across there. They go under that fence, which belongs to Diversion Lake Club. They have fished in those waters. I have seen them on the land having their lunch and building camp fires and having lunch. That was the Diversion Lake Club's land.

" 'I have spoken to them about using this property and fishing there and trespassing. I talked to the boys first when they came out there. At first I asked them not to use it. I have never given them my permission to go in there and the Diversion Lake Club has never given them permission to go in there. I have only seen them on the banks, or on the land, having their lunch. They did not ask me for permission to use the land or get on the land for that purpose.

" 'The water of the lake there is beyond the original bed of the river. I couldn't say exactly how much beyond. I have never seen a map of the river but that river, ordinarily at places this time of the year, you can step across it, but now it is wide. I judge the average width of the bed of the river in between those two dams is about ten or fifteen feet. The water of the lake extends way beyond the original bed of the river.'

"In addition to the fence around all of the property consisting of an eight foot wire fence, there is a fence across the river consisting of a five wire fence. It is not right down in the river so that it usually stays about the water's edge. It doesn't come

down to the water's edge. We put it there on account of stock and deer getting out. We have, I suppose, 25 or 30 deer in there. I have a few milch cows. The club owners have saddle horses."

The statute on the question, article 1377 (1235), is as follows:

"Whoever shall enter upon the inclosed land of another without the consent of the owner, proprietor or agent in charge thereof, and therein hunt with firearms or thereon catch or take or attempt to catch or take any fish from any pond, lake, tank or stream, or in any manner depredate upon the same, shall be guilty of a misdemeanor, and upon conviction thereof, shall be fined any sum not less than $10.00 nor more than $200.00 and by a forfeiture of his hunting license and the right to hunt in the State of Texas for a period of one year from the date of his conviction. By 'inclosed lands' is meant such lands as are in use for agriculture or grazing purposes or for any other purpose, and inclosed by any structure for fencing either of wood or iron or combination thereof, or wood and wire, or partly by water or stream, canyon, brush, rock or rocks, bluffs or island. Proof of ownership or lease may be made by parol testimony. Provided, however, that this Act shall not apply to inclosed lands which are rented or leased for hunting or fishing or camping privileges where the owner, proprietor, or agent in charge or any person for him by any and every means has received or contracted to receive more than twenty-five cents per acre per year or any part of a year for such hunting, fishing or camping privileges, or where more than $4.00 per day per person is charged for such hunting, fishing or camping privileges. And provided further that this exemption shall exist for a period of one year from the date of the receipt of such sum or sums of money.

"Sec. 2. Any person found upon the inclosed lands of another without the owner's consent, shall be subject to arrest by any peace officer, and such arrest may be made without warrant of arrest. (As amended Acts 1929, 41st Leg., 1st C. S., p. 242, ch. 100, Acts 1929, 41st Leg., 2nd C. S., p. 41, ch. 26.)"

This statute has been construed by the Attorney General and upheld. Of course, his holding is not to be held as authority, but it is persuasive. The burden was on appellants to show that the Medina river at this diversion dam was a navigable stream, and we think they failed to do so.

Of course, there is a general right in the public (or any one with a license) to fish in the public streams and waters, but there is no such right inferred that permits a trespass upon the lands of another. King v. Schaff (Tex. Civ. App.) 204 S. W. 1039; Smith v. Godart (Tex. Civ. App.) 295 S. W. 211.

In Knudson v. Hull, 46 Utah, 114, 148 P. 1070, it is held that: "Although a person is entitled to fish in a river, that right does not entitle him to fish in waters which are on another's land because of overflows, or which are not a part of the natural channel of the river."

The property trespassed upon is very valuable, and we think appellee is entitled to an injunction to protect it in its property rights, and the judgment of the trial court is affirmed.